BOSTON SAFE-DEPOSIT & TRUST CO. *v.* BANKERS' & MERCHANTS' TEL. CO. *et al.*

*(Circuit Court, S. D. New York.* September 17, 1888.)

**1. CORPORATIONS—CONSOLIDATION—MORTGAGES—LIEN—PRIORITY.**

In order to effect an amalgamation of the two telegraph corporations, two agreements were entered into, by one of which the B. & M. Co. covenanted to construct and deliver to the R. Co. certain systems of telegraph lines, (among them one connecting Buffalo by a northerly route with Chicago,) and the R. Co. agreed to create its bonds for $3,000,000, to be secured by a mortgage of all its franchises and property, including the property to be thereafter acquired from the B. & M. Co. The other agreement was between the B. & M. Co. and one B., by which B. was to act as trustee for the B. & M. Co. to exchange the $3,000,000 of bonds, dollar for dollar, for the stock of the R. Co.; and deliver to the B. & M. Co. the stock received by him in exchange for the bonds as soon as 51 per cent. of the whole stock of the R. Co. was received by him. The two agreements contemplated that the B. & M. Co. should obtain the property and control of the R. Co. by obtaining all or the majority of its stock, giving the stockholders of the R. Co. the option to transfer their shares for bonds secured by a mortgage upon all the existing and to be acquired property of the R. Co. The scheme was carried out, and the B. & M. Co. acquired a majority of the stock of the R. Co., and while in control of the latter corporation reconstructed and rebuilt some of its telegraph lines, and acquired new rights of way in the name of the R. Co. to straighten the lines, and strung new and additional wires upon the poles. It also constructed one of the new lines which it had agreed to build, and connected the wires with the existing system of the R. Co., and operated them as part of the general system; and partially constructed some of the other new lines which it had agreed to build. It also strung additional wires upon other lines of the R. Co. pursuant to an agreement between the two companies by which each was to have the right to string wires on the poles of the other at a specified rental. Soon after the B. & M. Co. acquired control of the R. Co. it created a mortgage of $10,000,000 upon all its existing property, which also conveyed all the property of the B. & M. Co. to be thereafter acquired. The new line built by it was paid for out of the proceeds of this mortgage; and it became insolvent before it had completed the building of any of the other new lines. The $10,000,000 mortgage was foreclosed, and all the property of the B. & M. Co. was purchased by the U. L. Co. at the sale under the foreclosure decree. At the time of the purchase the U. L. Co. had notice of the terms of the $3,000,000 mortgage. In a suit brought in aid of a suit to foreclose the $3,000,000 mortgage, to subject to the operation of the decree property claimed by the W. U. Co. as a purchaser at the foreclosure sale of the $10,000;000 mortgage, *held,* (*a*) There being no questions arising under the registry acts, and the U. L. Co. being a purchaser with notice of the terms of the $3,000,000 mortgage, the rights of the bondholders of the $3,000,000 mortgage were paramount to those of the U. L. Co.

**2. SAME—PROPERTY SUBJECT TO.**

(*b*) That the reconstructed lines were subject to the lien of the $3,000,000 mortgage, because the improvements upon the mortgaged property became part of the realty.

**3. SAME—TELEGRAPH COMPANIES—STRUNG WIRES.**

(*c*) That the strung wires did not become part of the realty by annexation, because the two companies had agreed in effect that they should remain personalty; and that it was competent for the two companies by such an agreement to determine the character of the property annexed, as against an existing mortgage.

**4. SAME—NEW LINES.**

(*d*) That the new line built by the B. & M. Co. for the R. Co. under the agreement between the two companies became in equity the property of the R. Co. as soon as completed, without any transfer from the B. & M. Co., and being described in the mortgage of the R. Co. as part of the after-acquired property included in it, inured to the security of the bondholders; and that the com-

plainant as trustee for the bondholders succeeded to the right of the R. Co. to compel a conveyance of the new line by the B. & M. Co. and those claiming under that company

5. SAME—AFTER-ACQUIRED PROPERTY.

(e) That a mortgage of property to be thereafter acquired takes effect as a valid lien immediately when the property is acquired by the mortgagor; and that, as between successive mortgages of after-acquired property, priority of lien is determined by priority of time; the mortgage first in point of time being the senior lien

In Equity.   Bill ancillary to a bill for foreclosure of mortgage.

*Marsh, Wilson & Wallis,* for complainant.

*R. G Ingersoll,* for defendants.

WALLACE, J. The complainant is the trustee named in a mortgage made by the American Rapid Telegraph Company, bearing date September 1, 1883, to secure $3,000,000 of bonds, for $1,000 each, with interest, payable semi-annually, from March 1, 1884, and maturing September 1, 1893   This mortgage was created by the American Rapid Telegraph Company pursuant to an agreement made August 28, 1883, with the Bankers' & Merchants' Telegraph Company   It is expressed, in terms, to cover all the existing lines and property of the American Rapid Telegraph Company, "together with the lines of telegraph intended to be shortly constructed or acquired for the party of the first part, (the mortgagor,) so as to connect the following points: Buffalo, N. Y., by a northerly route, with Chicago, Ill.; Pittsburgh, Pa., via Columbus, Ohio, Indianapolis, and Terre Haute, Ind., with St. Louis, Mo.; Columbus, Ohio, with Cincinnati, Ohio, and Louisville, Ky.; and Terre Haute, Ind., with Chicago, Ill." Default having been made in the payment of the interest upon the bonds, the complainant filed a bill for the foreclosure of the mortgage in the circuit court of the United States for the district of Connecticut, the mortgagor being a Connecticut corporation; and an ancillary bill was filed in this court. The present suit is brought in aid of the foreclosure suit, the defendants being in this jurisdiction, to subject to the operation of the decree certain telegraph property to which some of the defendants claim title. Relief is prayed, in substance, that this property be adjudged to be subject to the lien of the mortgage, and, when sold under the decree in the foreclosure suit, that the claims of the defendants be barred and cut off. Relief is also prayed that the defendants be required to convey the property to the complainants.

The Bankers' & Merchants' Telegraph Company created a mortgage, bearing date November 24, 1883, to secure bonds to the amount of $10,-000,000, in which the Farmers' Loan & Trust Company was named as the trustee; and the claim of the defendant the United Lines Telegraph Company to the property in question is founded upon this mortgage, being derived by purchase upon a decree of foreclosure thereof, under which it asserts a title paramount to the complainant's title. No other defendant sets up any adverse claim or title to the property except the defendant Stokes. He answers jointly with the United Lines Telegraph Company, and his answer alleges that a part of the property in contro-

v.36F.no.5—19

versy was sold upon a judgment of the court of common pleas of Cuyahoga county, Ohio, and he became the purchaser at the sale. As it appears in the proofs that this sale was set aside and vacated as void by an appellate court having jurisdiction, and the suit in which the judgment was obtained dismissed, and as Stokes sets up no other right or claim by his answer, the controversy is reduced to the single question of title as between the complainant and the United Lines Telegraph Company to the property in dispute. The complainant is entitled to a decree if the mortgage made by the American Rapid Telegraph Company is a prior lien to the mortgage made by the Bankers' & Merchants' Telegraph Company upon the property described in the bill and known as (1) the "Reconstructed Lines;" (2) the "Western Lines;" and (3) the "Strung Wires." Although the bill alleges the priority of complainant's title to certain lines of telegraph extending from Indianapolis to Richmond, thence to Cincinnati and Newark, and from Newark to Pittsburgh, this contention was abandoned at the hearing, and the only part of the "Western Lines" now involved is the line between Cleveland and Chicago.

In August, 1883, those who respectively controlled the Rapid Company and the Bankers' & Merchants' Company concerted a scheme by which the Bankers' & Merchants' Company was to acquire the control and property of the Rapid Company, and the stockholders of the Rapid Company were to transfer their stock to the Bankers' & Merchants' Company, and become mortgage bondholders of the Rapid Company, instead of stockholders. At that time the Rapid Company owned and was operating a telegraph-system extending from Boston in the east to Cleveland in the west and Washington in the south, having stations in the more important places between these points. It had been constructing its lines for several years, and stations were established at those points between which the lines were completed. It had a line from New York, through New Haven, Hartford, and Providence, to Boston; one from Hartford to Springfield; one from Albany to Buffalo, with branches running to Saratoga and Albany, and to the stockyards at West Albany; one from Buffalo to the oil regions, and Newcastle to Pittsburgh; one from Newcastle to Cleveland; one from Canton, through Cleveland, to Coshocton; one from Canton to Sherredsville, Ohio; one from Philadelphia, through Harrisburg, to Pittsburgh; one from Harrisburg to Baltimore; and there were several "loop lines." Its system was incomplete, and those in control of the corporation believed that the extention and completion of the system was essential to the prosperity of the company. The company had been doing business at a loss, but its business was increasing. It had no bonded debt, and its property represented an expenditure of between $2,000,000 and $3,000,000. The Bankers' & Merchants' Telegraph Company owned and was operating a line from New York to Washington. Its business was profitable, and its stock was selling considerably above par. Those who controlled it contemplated extending its system to the New England states, and in the south and west. It was in a good financial condition, and, with a view of extending its system, had created a mortgage upon its property for $300,000, and was in a position to realize about $1,000,000 by the sale of its unissued capital

stock.    In this situation those in control of the two corporations came to an understanding by which the two concerns were to be practically merged in one, with the Bankers' & Merchants' Company as the owner and manager.    To effect this object, and to induce the stockholders of the Rapid Company to transfer their stock to the Bankers' & Merchants', two contracts were executed, bearing date, respectively, August 28, 1883, and August 29, 1883.    The first was a contract between the Bankers' & Merchants' Company and the Rapid Company, by which the former covenanted to construct or acquire and deliver to the latter a system of four-wire telegraph lines connecting Buffalo by a northerly route with Chicago; Pittsburg with St. Louis, via Columbus, Indianapolis, and Terre Haute; and Columbus, Louisville, and Terre Haute with Chicago; and in consideration thereof the Rapid Company agreed to create its bonds for the amount of $3,000,000, to be secured by a mortgage covering all its franchises and property, including the telegraph lines which were to be built or acquired for it by the Bankers' & Merchants' Company, and deliver them to the Bankers' & Merchants' Company.    The second contract was entered into between the Bankers' & Merchants' Company and one Bullens, and by its terms Bullens agreed to act as a trustee, to whom the Bankers' & Merchants' Company was to deliver the $3,000,000 of bonds for exchange, dollar for dollar, for the stock of the Rapid Company.    By this contract Bullens was to deliver to the Bankers' & Merchants' Company 51 per centum of the stock of the Rapid Company, as soon as the same was received by him from the holders of such stock, and was to retain the balance of such stock received by him in exchange for bonds, and the balance of the bonds not exchanged, until the completion of the lines of telegraph agreed to be built or acquired for the Rapid Company by the Bankers' & Merchants' Company, and then to deliver the balance to the latter.    The two contracts are to be regarded as executed simultaneously.    Viewed in the light of the testimony and read in connection with a third contract made at the same time by the Bankers' & Merchants' Company, to which particular reference is unnecessary, it is plain that it was the understanding on the part of all concerned that the Bankers' & Merchants' Company was to acquire the property and control of the Rapid Company by acquiring all or a majority of the stock of that company, and that the stockholders of the Rapid Company, as an inducement to their consent, were to receive the bonds, dollar for dollar, in exchange for their stock, secured by a mortgage which was to cover not only all the property which was then owned by the Rapid Company, but also the new lines which the Bankers' & Merchants' Company was to construct and deliver according to contract.    Pursuant to this scheme, the bonds and the $3,000,000 mortgage were created by the Rapid Company; the bonds were placed by the mortgagee in the hands of Bullens; the stockholders of the Rapid Company delivered to Bullens more than 28,000 of the 30,000 shares of which the capital stock of that company consisted; and Bullens transferred to the Bankers' & Merchants' Company the 51 per centum of the whole capital stock, pursuant to the agreement by which he became trustee.    Shortly afterwards officers and directors of the Bankers' & Merchants' Company

were made officers and directors of the Rapid Company, and the Bankers' & Merchants' Company assumed and exercised control and administration of the affairs of the Rapid Company; the leases of the offices theretofore occupied by the Rapid Company were transferred to the Bankers' & Merchants' Company; the wires belonging to the Rapid Company were connected with the offices of the Bankers' & Merchants' Company; and the business of both corporations was practically merged together, although distinct organizations were maintained. Soon after this change of control was effected, the managers proceeded to repair and reconstruct some of the existing lines of the Rapid Company, and to build or acquire the new lines which, by the contract between the two companies, were to be built or acquired for the Rapid Company by the Bankers' & Merchants' Company The line extending from Meriden, Conn., to Boston, via Hartford and Providence, and the line in the state of New York extending from the Harlem river to Portchester, were substantially rebuilt on the original lines of the Rapid Company. The lines were straightened, and, when necessary for this purpose, new rights of way were obtained in the name of the Rapid Company. Many of the old poles were discarded, and new ones put in their places, additional wires were strung, and such was the character of the repairs and improvements that these lines were practically reconstructed, and adapted to carry a larger number of wires than the original lines. These lines are the "reconstructed lines" in controversy.

In the early part of 1884 a new line of telegraph was built by the Bankers' & Merchants' Company, connecting the system of the Rapid Company at Cleveland with Chicago. This line extended from Cleveland to Freeport, and from Freeport to Hammond, near Chicago, until it met an underground telegraph system leading into the city of Chicago. The system of the Rapid Company reached Cleveland from Buffalo by the way of Newcastle, in Pennsylvania, and Streetsboro, in Ohio. The new line from Cleveland to Chicago was built upon rights of way secured in the name of the Bankers' & Merchants' Company, or subordinate corporations of which that company was the owner, and through which it acted. Mr. May, who represented the Rapid Company, was requested by the officers of the Bankers' & Merchants' Company to supervise the selection of the route, and did so. While the line was in process of construction it was understood by those who represented the Bankers' & Merchants' Company and the Rapid Company that it was being built to form a part of the line which was to be a connected system with the Rapid Company, at Buffalo, by a northerly route with Chicago. The portion of the new line, which was to extend from Cleveland to Buffalo by a northerly route, was not commenced. The new line from Chicago to Cleveland was inspected and accepted by the Bankers' & Merchants' Company, and was connected with the Rapid system at Cleveland, and the wires run into the office of the Rapid Company there. As early as in July, 1884, the line was used as an adjunct of the Rapid system. There was no formal transfer or delivery of this line by the Bankers' & Merchants' Company to the Rapid Company. The com-

plainant insists that the $3,000,000 mortgage is a lien upon this line paramount to that of the $10,000,000 mortgage and the rights acquired under it by the United Lines Telegraph Company at foreclosure sale.

The contemplated new lines for extending the system of the Rapid Company from Pittsburgh, by way of Indianapolis and Terre Haute, with St. Louis, Columbus with Cincinnati and Louisville, and Terre Haute with Chicago, which, by the August agreement, the Bankers' & Merchants' Company promised to build or acquire for the Rapid Company, were not completed. Detached portions of these lines were built, but before the lines were completed the Bankers' & Merchants' Company became insolvent, a receiver of its property and effects having been appointed in September, 1884. As has been said, it was not insisted on at the hearing that the $3,000,000 mortgage became a lien upon these uncompleted lines, and it is therefore unnecessary to consider the question whether it did or not; but it is proper to state that there seem to be quite satisfactory reasons why the claim, if urged, could not prevail.

The property known as the "Strung Wires" consists of lines of wire strung by the Bankers' & Merchants' Company upon the poles of the Rapid Company, and which were used and employed, in conjunction with the other wires of the two companies, as part of the general system, while the Bankers' & Merchants' Company was in control of both companies, and before it became insolvent. As to this property the case involves the question of fact whether a contract was made between the two companies by which each was to have the right to string wires and maintain them on the poles of the other on payment of a rental of four dollars per mile per wire, annually, the wires to become the property of the lessee if not removed within six months after notice to do so. The evidence that such a contract was made consists (1) of an entry in the minute book of the executive committee of each company, as of the date of October 18, 1883, showing that a resolution was that day adopted by the committee to enter into such a contract; (2) an agreement in writing between the two companies embodying the agreement referred to in the minutes of the two committees, which purports to have been made on October 18, 1883, and is signed for the Bankers' & Merchants' Company by its then president and for the Rapid Company by its then general manager; and (3) a resolution of the board of directors of the Rapid Company, adopted August 14, 1884, ratifying and approving the previous contract. The bill asserts that the contract was an afterthought, and that the entries in the minute-book of the executive committee of the respective companies were fabricated, and that the written agreement was not executed until it was made in contemplation of the insolvency of the Bankers' & Merchants' Company. In support of this theory testimony is given by several of the persons who principally represented the interests of the bondholders of the Rapid Company while the two companies were amalgamated, one of whom was a member of the executive committee of the Rapid Company, to the effect that they did not hear of any such resolution, and had no information about such a contract prior to the meeting of the board of directors in August, 1884. It will not be profitable

to consider in detail the testimony upon the issue whether the contract was really made. If it was not made it should have been, in justice to the interests of the stockholders of the Bankers' & Merchants' Company; because what was about to be done involved a large expenditure of their money, and they should have been protected as far as practicable against just such a contingency as has arisen. The terms were fair for all the parties interested, and there is not the slightest reason to suppose that any of those who represented the bondholders of the Rapid Company would have objected if they had been consulted. It was not necessary to consult them, because the managers of the Bankers' & Merchants' Company had full power to commit them by the control of the majority of stock of the Rapid Company and a majority vote in its executive committee and board of directors. An omission to provide for such a contract, and to have it properly authenticated, would have been inconsistent with the methods which prevailed at the time in the management of the companies of keeping the relations between them formally distinct, and their transactions as those of separate concerns acting through their respective agents. Such entries as appear in the minute-books of the executive committees do not, upon inspection of the books, appear to have been interpolated, but appear in their regular, chronological order, and seem to be in all respects regular; and there is nothing to indicate that the books have been tampered with. It is much more reasonable to conclude that what took place with reference to the contract was not impressed upon the attention of Mr. May and the others, because it was proper and reasonable, and a matter of course, than to suppose that the evidence has been fabricated.

It has been urged against the validity of the mortgage made by the Rapid Company that it was created merely as a device to enable the Bankers' & Merchants' Company to acquire the property of the Rapid Company; that the scheme was a fraud upon the stockholders of the respective companies, and intended to be a fraud upon the public; and that the agreement between the two companies, under which the mortgage was created, was *ultra vires* as to each corporation. Without considering at present what the effect would be upon the legal rights of the parties if this contention were maintainable upon the proofs, it is proper to consider whether there is any foundation in fact for the charge of bad faith. As has been stated, the $3,000,000 mortgage was doubtless made in order that the Bankers' & Merchants' Company could acquire the shares of the stockholders of the Rapid Company in exchange for the bonds. It was intended as an instrumentality to effect that object, and to give the stockholders of the Rapid Company the option of transferring their shares to the Bankers' & Merchants' Company, and taking bonds in exchange for their stock. All concerned understood that if the Bankers' & Merchants' Company could acquire all the shares of stock in the Rapid Company, or practically all, it would acquire the control and substantial ownership of the property of that corporation. What the stockholders of the Rapid Company would get for their stock would depend upon the value of the $3,000,000 mortgage as security for the bonds. As a considera-

tion for surrendering their control of their own property, and virtually transferring it to the Bankers' & Merchants' Company, they relied upon the understanding that their bonds were to be fortified by the additional security of the new lines which were to be built by the Bankers' & Merchants' Company, and when built or acquired were to be covered by the lien of the mortgage. They took the chances of the good faith of the Bankers' & Merchants' Company in carrying out the agreement, and of its financial ability to fulfill. It is impossible to discover anything immoral or dishonest in the transaction upon the part of the Rapid Company, or of its stockholders. It was entirely legitimate for the stockholders to obtain all they could for their property. It may be that they expected to get more for their shares than the shares were really worth, but they were only to get such a consideration as the purchaser was willing to give; and they knew what they would ultimately receive was largely contingent upon the success of the purchaser in carrying out its enterprises. On the other hand, the purchaser, or the persons who were in control of the Banker's & Merchants' Company, doubtless considered that the acquisition of the property of the Rapid Company was worth all it would cost. Probably they could have duplicated the property at the time for much less than $3,000,000. But they were to get by the purchase, besides the property, an established business, and good will, and at the same time remove a rival whose competition would impair the profits of their business. Whatever they might expend upon the property, by way of improvements, or by way of extending the existing system, would ultimately be to the advantage of the Bankers' & Merchants' Company. There is nothing in the proofs to denote that those in control of the Bankers' & Merchants' Company were not acting in good faith towards the stockholders of the Rapid Company, or their own company, or the public; or that there was any plan or purpose in view on their part except to promote and consummate the legitimate business scheme of merging the two companies together, and building up an extensive telegraph business by extending and consolidating the existing systems. It is very probably true that some of the persons concerned expected to make money for themselves by marketing their shares and trading in the securities; and if this were so it would not militate against any rules of law or necessarily of ethics. There is no fair reason to doubt that the promoters would have honestly carried out their enterprise, and that their expectations would have been measurably realized if it had not become financially crippled at an early stage in its progress. Although the Bankers' & Merchants' Company created a mortgage of $10,000,000 very soon after it acquired control of the Rapid Company, which covered all its own property and the property of the Rapid Company, and was to cover all the property to be thereafter acquired by the Bankers' & Merchants' Company, and although the bonds of this mortgage were floated at what now seems an extravagant price, the proofs do not show that the parties to the August agreement, either those who represented the Rapid Company or those who represented the Bankers' & Merchants' Company, had any fraudulent design upon the public which were to be carried out

by means of this mortgage. It cannot be assumed that they supposed the public would buy the bonds without some investigation into the merits of the enterprise and the value of the securities; and if they intended to put the bonds off upon the public by any fraudulent concealment or misrepresentation, the evidence fails to furnish a foundation for the theory. It has been argued that this mortgage was created to enable the Bankers' & Merchants' Company to build the new lines which it had agreed to build by its contract with the Rapid Company; that those who controlled the Bankers' & Merchants' Company intended to raise the money by deluding the public in the belief that the mortgage would be a first lien upon all new lines which were to be built, when in fact the lien would be subordinate to that of the $3,000,000 mortgage; and that those who represented the Rapid Company, when the August agreement was made, understood at the time that this was the scheme contemplated, and thereby became participants in misleading those who invested in the bonds of the $10,000,000 mortgage. In this argument the fact is ignored, which has already been referred to, that when the August agreement was made the Bankers' & Merchants' Company had in its treasury, or available, the sum of about $1,000,000, and was supposed by those who represented the Rapid Company to be financially able to carry out its undertaking. The case is destitute of evidence to justify the assumption that those who represented the Rapid Company supposed that the contract of the Bankers' & Merchants' Company was to be carried out at the expense of third persons, much less to be carried out by defrauding third persons. The fact that the Bankers' & Merchants' Company did use the bonds of the $10,-000,000 mortgage to get the means for building the new line is not inconsistent with the good faith of its officers. By doing this they were enabled to use its other resources for other legitimate objects. But whatever may have been the design of those who controlled the Bankers' & Merchants' Company, whether honest and legitimate, or the contrary, the bondholders represented by the complainant are not shown to have been implicated in any fraudulent scheme. The organic law of the corporations permitted them to do what was provided for by the August agreements, and there is no ground upon which to assail the $3,000,000 mortgage as *ultra vires.* Laws N. Y. 1870, c. 568. It is not obvious how any such considerations as have been suggested would be pertinent in the present suit, if there were any foundation for them in fact. The Rapid Company does not assert any objection to the mortgage. Those who were stockholders of that company, and became bondholders, do not, and the Bankers' & Merchants' Company, after receiving the mortgage and exchanging the bonds for stock, cannot be heard to allege want of consideration or a fraudulent consideration, or that its acts in acquiring and transferring the bonds were without legal validity, while it retains the stock which it received as the fruits of the transaction. Nor can the Bankers' & Merchants' Company be permitted to assert that the August agreement was *ultra vires* while retaining the fruits. *Mining Co. v. Bank*, 96 U. S. 640; *Bank v. Matthews*, 98 U. S. 621; *Arms Co. v. Barlow*, 63 N. Y. 62; *Railroad Co. v. Transportation Co.*, 83 Pa. St. 160; *Bly v. Bank*,

79 Pa. St. 453. And it is equally clear that the bondholders of the $10,-000,000 mortgage, who became creditors of the Bankers' & Merchants' Company after all these transactions took place, cannot be heard to impeach the consideration of the complainant's mortgage. *Graham* v. *Railroad Co.*, 102 U. S. 148.

No good reason having been suggested why the mortgage is not valid, and why it should not be enforced, the question as to the rights of the parties in the property in controversy is merely whether it is covered by the lien of the mortgage, or equitably belongs to the complainant, and whether the rights of the complainant therein are paramount to those acquired under the $10,000,000 mortgage. No satisfactory reason is assigned why the lien of the $3,000,000 mortgage should not include the reconstructed lines. The mortgage was duly recorded before the $10,-000,000 mortgage of the Bankers' & Merchants' Company was recorded, and no question arises under the registry act as to the priority of lien of the respective mortgages. If it should be conceded that the money of the Bankers' & Merchants' Company was exclusively used in the improvement and reconstruction of these lines, and that the improved value of the property represents nothing except what was put into it by that corporation, there is nothing to distinguish the case from the ordinary one where a mortgagor or his vendee of the mortgaged property makes repairs and improvements of a permanent character. Such improvements as become a part of the realty always inure to the security of the mortgage. Illustrations of the application of the rule in somewhat analogous cases are found in *U. S.* v. *Railroad Co.*, 12 Wall. 362; *Butler* v. *Page*, 7 Metc. 40; and *Snedeker* v. *Warring*, 12 N. Y. 170. But the strung wires do not fall under the operation of this rule. Inasmuch as they can be removed without material injury to the structure, they do not lose their character as personalty, and become a part of the realty, if it was the intention and contract of the two companies, at the time they were affixed to the poles of the Rapid Company, that they should retain their original character. With respect to this class of property the parties in interest may agree that it shall remain personalty, subject to be removed; and such an agreement determines the real character as against an existing mortgage. The effect of such an agreement, where the subject was the annexation of telegraph wires to telegraph poles, was considered in *Telegraph Co.* v. *Railroad Co.*, 11 Fed. Rep. 1, and it was ruled that the wires did not pass under an existing mortgage. The general doctrine is so well established that it is unnecessary to cite authorities.

The line from Cleveland to Chicago was constructed "to connect Buffalo by a northerly route with Chicago," pursuant to the agreement of August 28, 1883, and is the same property described and conveyed in the mortgage as one of the lines "to be shortly constructed or acquired" for the Rapid Company. The circumstance that there was no formal delivery or transfer of this property to the Rapid Company by the Bankers' & Merchants' Company is not material. Equity regards that as done which ought to have been done; and as soon as the property was acquired by the Bankers' & Merchants' Company it became in equity the

property of the Rapid Company. The complainant, at that time, by reason of the conveyance in the mortgage deed, succeeded to the right of the Rapid Company to enforce a specific performance of the contract against the Bankers' & Merchants' Company. It was competent for the Rapid Company to mortgage the lines which were not in existence at the date of the instrument, but which by the contract of the Bankers' & Merchants' Company were thereafter to be built or acquired by that company for the Rapid Company, and by the terms of the mortgage were to inure to the security of the bondholders. Such a mortgage, although ineffectual as a conveyance *in præsenti*, takes effect as an equitable transfer, and attaches to the after-acquired property as soon as the title of the mortgagor accrues. *Pennock* v. *Coe*, 23 How. 117; *Dnnham* v. *Railway Co.*, 1 Wall. 254; *Railroad Co.* v. *Cowdrey*, 11 Wall. 459; *Butt* v. *Ellett*, 19 Wall. 544; *Holroyd* v. *Marshall*, 10 H. L. Cas. 209. The case is exceptional only because it presents a question of priority as between two mortgages of after-aquired property. Although the $10,000,000 mortgage was not, like the $3,000,000 mortgage, expressed to cover the specific property to be thereafter acquired, there is nothing in this feature alone to postpone it to the latter. Upon the principle that, as between equal equities, priority of time will prevail, the lien of the $3,000,000 mortgage is paramount to that of the $10,000,000 mortgage subsequently created. Grantees and incumbrancers claiming in equity take and are ranked according to the dates of their securities, because the purchaser of an equitable title takes it subject to all prior equities, and the grantor or assignor cannot transfer a greater interest than he himself possesses. In the attempt to avoid the application of this rule, in the present case, much stress has been laid upon the circumstance that the line in question was paid for in bonds of the $10,000,000 mortgage, or with the proceeds of such bonds at the time it was built; but this fact is of no legal significance. Those who bought the bonds secured by that mortgage have no higher claim for consideration than the bondholders of the $3,000,000 mortgage who parted with their property upon the promise that this line should stand as a security for the payment of their bonds. In *Railroad Co.* v. *Cowdrey*, 11 Wall. 459, similar considerations were urged, but were not countenanced by the court. The United Lines Telegraph Company does not occupy the position of a *bona fide* purchaser of the property. Full notice of the equities and claim of the complainant was given it before it purchased the property at the foreclosure sale. It acquired the rights of the bondholders in the $10,-000,000 mortgage, and nothing more. It has been suggested in argument for the defendants that receivers' certificates were created pursuant to the order of the court in suits brought in the courts of the state of New York and Ohio, in which receivers of the property of the Bankers' and Merchants' Company were appointed, which certificates were declared by the orders to be first liens on all the property of the company; and it is urged that the lien of the $3,000,000 mortgage cannot have precedence of these certificates. As the complainant was not a party to these suits, the orders by which their certificates were created are nuga-

tory as an adjudication upon its equities. No judgment in these suits could bind complainant by a declaration that the certificates should outrank its equitable lien. It is entirely clear that a purchaser of such certificates would not acquire a lien prior to the $3,000,000 mortgage upon the property included in it when it was recorded, or upon the accessorial improvements and additions. It is not so clear that a purchaser without notice, and for value, would not obtain a paramount lien upon the western lines, assuming that the certificates were authorized by the order or decree of a competent court in possession of the property at the time by its receivers. But these questions are not properly here, and cannot be considered under the issues made by the pleadings. The defendants do not assert in the answer that they are *bona fide* purchasers of such certificates, but, as has been mentioned, one of them, the United Lines Telegraph Company, sets up title under the foreclosure of the $10,-000,000 mortgage, and the other, the defendant Stokes, founds his claim upon the sale by the Ohio court, which has been set aside. It may be gathered from the record that the certificates which were issued by the receivers were subsequently used as cash, and applied towards the purchase money at the sale in the foreclosure of the $10,000,000 mortgage. If this were so, the certificate holders would not require any protection, and this is probably the reason why no attempt has been made to present the defendants as certificate holders in the answer. It is no obstacle to the relief prayed for by the bill that the real estate sought to be subjected to the decree lies in another state. It suffices that the court has jurisdiction of the persons of the defendants, and can compel them to observe its decree. *Muller* v. *Dows*, 94 U. S. 444. A decree is ordered for the complainant, conformably to the conclusions which have been expressed. If necessary there will be a reference to a master to ascertain what property is to be included in the description of the "reconstructed lines" in the decree.