**WESTINGHOUSE ELECTRIC & MFG. CO. v. BROOKLYN RAPID TRANSIT CO., et al.**

**CENTRAL UNION TRUST CO. OF NEW YORK v. SAME.**

(District Court, S. D. New York. October 6, 1921.)

Nos. E 15–347, E 16–164.

1. **Mortgages ⬅131—Intent of parties as to after-acquired property controls.**
 In construing after-acquired property clauses in mortgages the court must ascertain the intent of the parties.

2. **Corporations ⬅478—Parties held to intend to bring after-acquired property in as security.**
 A mortgage of a rapid transit company, containing the granting clause "all and singular the property and franchise of the said transit com-

pany whether now owned or hereafter acquired, including particularly the property hereinafter described, and does hereby pledge and hypothecate the same, that is to say," etc., *held* to intend that the lien should cover after-acquired property other than that specifically mentioned.

3. Mortgages �══101—Words not treated as useless.

In construing mortgages the court will not treat as useless words or phrases to which a natural meaning can be given.

4. Mortgages �══106—Surrounding circumstances considered.

The court may look to the surrounding circumstances to aid in interpreting a mortgage.

5. Mortgages �══131—After-acquired property when covered by mortgage.

Where property is acquired by a later bond issue, under circumstances where it is plain that the later bonds or their proceeds would not have been created and utilized to acquire such property without the safeguard of a first lien, then property so acquired is not first subject to the lien of a prior mortgage, unless the prior mortgage by express language warns subsequent mortgagees that such after-acquired property will be subject to the lien of the prior mortgage.

6. Mortgages �══131—Mortgage covering after-acquired property creates equitable lien good against subsequent mortgagee with notice.

A mortgage covering after-acquired property of a transit company creates an equitable lien which is good as against a subsequent mortgagee with notice.

In Equity. Suits by the Westinghouse Electric & Manufacturing Company and by the Central Union Trust Company of New York, respectively, against the Brooklyn Rapid Transit Company and others. Respective rights of trustees under mortgages determined.

Larkin, Rathbone & Perry, of New York City (Henry V. Poor, James L. Banks, Jr., and Stephen A. Van Ness, all of New York City, of counsel), for Central Union Trust Co. as trustee.

Murray, Prentice & Aldrich, of New York City (George Welwood Murray, William Roberts, and Henry C. Place, all of New York City, of counsel), for defendant Equitable Trust Co. of New York, trustee.

Collin, Wells & Hughes, of New York City (John L. Wells, of New York City, of counsel), for 1895 Bondholders' Committee.

Chadbourne, Hunt & Jaeckel, of New York City (William M. Chadbourne and Frank Marsh, both of New York City, of counsel), for Committee of Contract Creditors of Brooklyn Rapid Transit Co.

MAYER, District Judge. There is pending a foreclosure suit which is brought by Central Union Trust Company of New York to foreclose what is known as the first refunding gold mortgage of Brooklyn Rapid Transit Company, dated July 1, 1902.

The B. R. T. executed a mortgage, dated October 1, 1895, to Central Trust Company, trustee, under which mortgage the Equitable Trust Company of New York is now acting as substituted trustee. As the latter trustee claims that its mortgage operates as a first lien on certain property, it was deemed desirable that certain issues should be decided by the court in the first instance; for, if the decision were adverse to the trustee of the 1895 mortgage, it was thought that the proceedings before the special master could be much abbreviated. To that end the court entered an order, dated April 1, 1921, providing, inter alia:

⟨══For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"(1) That the orders of this court dated October 20, 1920, and February 24, 1921, respectively, referring to Hon. E. Henry Lacombe, as special master, the issues raised by the pleadings in the above-entitled constituent cause, in equity, No. E 16–164, are hereby so modified as to withdraw after April 5, 1921, from further consideration by said special master all questions and issues relating: (a) To whether the defendant Equitable Trust Company of New York, as trustee under the mortgage of Brooklyn Rapid Transit Company, dated October 1, 1895, has any claim against or lien upon the stocks, bonds, and certificates of indebtedness deposited with Central Trust Company of New York, as trustee under the first refunding gold mortgage of Brooklyn Rapid Transit Company, dated July 1, 1902, and the properties formerly of Transit Development Company and embraced in its agreement, dated March 29, 1907, and its indenture dated July 24, 1915; and/or (b) to the relative priorities of the plaintiff and the defendant Equitable Trust Company of New York, as trustee as aforesaid, in and to said stocks, bonds, certificates of indebtedness, and other properties above mentioned."

For brevity:

(1) The mortgage dated October 1, 1895, will be referred to as the 1895 mortgage.

(2) The first refunding gold mortgage, dated July 1, 1902, as the 1902 mortgage.

(3) Brooklyn Rapid Transit Company, as B. R. T.

(4) Westinghouse Electric & Mfg. Co. v. Brooklyn Rapid Transit Company et al. (C. C. A.) 263 Fed. 532, as the Sea Beach Case.

(5) The four paragraphs in the 1895 mortgage covering specifically described property, as the four items. Sometimes, as will appear infra, it may be necessary to refer particularly to the items of existing property as distinguished from the after-acquired property provisions in these paragraphs, and vice versa.

On January 18, 1895, B. R. T. was organized under the Business Corporations Law of New York (Consol. Laws, c. 4) for the following purposes and with the following powers as stated in the certificate of incorporation:

"Second. The purposes for which it is to be formed are: The construction, extension, repair, improvements, equipment of, and furnishing the motive power for, railroad and other works, and aiding any corporation or individual in such construction, extension, repair, improvement, equipment, and furnishing of motive power.

"Third. The said corporation shall be authorized to purchase, acquire, hold, and dispose of the stocks, bonds, and other evidences of indebtedness of any corporation, domestic or foreign, and issue in exchange therefor its stock, bonds, or other obligations."

Under date of January 30, 1896—i. e., after the date of the B. R. T. incorporation—B. R. T. executed and delivered the 1895 mortgage. It was dated as of October 1, 1895. This antedating, it is agreed by counsel, was not significant, so far as the testimony discloses, except to fix the date from which interest should run.

The mortgage was to secure the issue of $7,000,000 face amount of 50-year 5 per cent. gold bonds. It may be here noted that of this issue $6,970,000 are outstanding in the hands of the public, $5,000 in the treasury of B. R. T., and $25,000 are pledged in the Brooklyn City Railroad Company guaranty fund.

The 1902 mortgage was executed and delivered to Central Trust Company of New York, as trustee, securing an authorized issue of $150,000,000 as face amount of 100-year 4 per cent. gold bonds. $57,-240,000 of these bonds have been authenticated and delivered, of which $29,619,000 have been converted into B. R. T. stock and canceled, leaving $27,621,000 distributed as follows: $3,439,000 in the hands of the public; $5,092,000 in the treasury of the receiver; $7,079,000 pledged to secure bank loans antedating the receivership; $10,000,000 pledged to secure Brooklyn Rapid Transit Company 6-year 5 per cent. secured gold notes; $250,000 pledged under the Brooklyn city guaranty fund; $1,761,000 owned by the Nassau Electric Railroad Company.

Between 1902 and December 31, 1918, the date of the receivership, there had been pledged and deposited with Central Union Trust Company of New York, and it now holds, as trustee under the 1902 mortgage, a large amount of the stock, bonds, and certificates of indebtedness of various companies.

The controversy, in part, is as to the lien of the respective mortgage trustees in respect of these stocks, bonds, and certificates of indebtedness.

The 1895 mortgage recited, inter alia, as follows:

"Whereas, the transit company has purchased and is about to acquire possession of all of the property and assets of the Long Island Traction Company, a Virginia corporation, including the capital stock of the Brooklyn Heights Railroad Company, the lessee, under an indenture of lease dated February 14, 1895, of all and singular the railroad and railroad routes and other property of the Brooklyn City Railroad Company; and

"Whereas, the transit company, in order to make payment for the property so purchased by it, and for other purposes of its incorporation, desires to borrow money, and, to that end, its board of directors has resolved to issue and dispose of the bonds of said transit company, secured by its mortgage of and upon all of its property, and has authorized the execution and delivery of these presents and the execution, delivery, and issue of said bonds to the aggregate amount of seven million dollars. * * *"

The granting clause of the mortgage was as follows:

"The said Brooklyn Rapid Transit Company, in consideration of the premises and of the sum of one dollar to it in hand paid by the trustee, the party hereto of the second part, receipt whereof by the said transit company is hereby acknowledged, and to secure the payment of the principal and interest of said bonds, hath granted, bargained, sold, assigned, transferred, and set over, and by these presents doth grant, bargain, sell, assign, transfer, set over, and deliver unto the trustee, the party hereto of the second part, its successor or successors and assigns, all and singular the property and franchise of the said transit company, whether now owned or hereafter acquired, including particularly the property hereinafter described, and does hereby pledge and hypothecate the same, that is to say:

"I. All the right, title and interest which the said transit company now owns or may hereafter acquire in and to the entire capital stock of the Brooklyn Heights Railroad Company, consisting of two thousand shares of the par value of one hundred dollars each.

"II. All dividends, income, interest, and increase to which the said transit company now is or may hereafter become entitled, by reason of its right, title, and interest in and to the capital stock of the Brooklyn, Queens County & Suburban Railroad Company, which said right, title, and interest is, however, subject to be diverted to and vested in the Brooklyn City Railroad Company in the contingency mentioned in a certain tripartite agreement

made and executed by and between the Long Island Traction Company, the Brooklyn, Queens County & Suburban Railroad Company, and the Brooklyn City Railroad Company, dated January 16, 1894.

"III. All net profits of or in any wise derived or receivable by said the Brooklyn Heights Railroad Company, as lessee as aforesaid under the above-mentioned lease of February 14, 1893, and also all other income of the Brooklyn Heights Railroad Company, after discharging its obligations under the said lease and remaining after paying an annual dividend of 10 per centum upon its capital stock, such remainder of said income having been duly granted and assigned by said the Brooklyn Heights Railroad Company to the Long Island Traction Company pursuant to agreement dated April 7, 1893, which said agreement is about to be assigned and delivered to the said transit company simultaneously with the delivery of these presents; also all right, title, and interest in and to the guaranty fund of $4,000,000 provided under the terms of the above-mentioned lease of the Brooklyn City Railroad Company to the Brooklyn Heights Railroad Company which, by the above-mentioned agreement of April 7, 1893, was granted and assigned by said the Brooklyn Heights Railroad Company to the Long Island Traction Company, and which by the assignment and delivery of said last-mentioned agreement to said transit company is now, or shall hereafter be vested in said transit company.

"IV. All the right, title, and interest of the transit company in and to the amount of the cost of all property, extensions, branches, additions, improvements, and equipments, heretofore and hereafter made, acquired, and paid for by the Brooklyn Heights Railroad Company or said transit company out of their own funds for use in connection with the operation of the railroads of the Brooklyn City Railroad Company, less the cost of such part thereof as shall or may be required to preserve said railroads, extensions, branches, additions, improvements, and equipments in good repair and serviceable condition during the existence of the lease hereinabove mentioned from said the Brooklyn City Railroad Company, as lessor, to the Brooklyn Heights Company, as lessee, and less the cost of such part thereof as shall or may be necessary to preserve and secure efficiency in the operation of such railroads; such cost, as aforesaid, being payable under the terms of the lease above mentioned by said lessor company to said lessee company, in the event of the expiration of said lease or other sooner termination thereof."

It was further provided as follows:

"Bonds of the issue hereby secured to the amount of four million eight hundred and seventy-five thousand dollars par value shall be certified by the trustee and issued to or upon the order of the transit company for use in making payment of part of the purchase price payable by the transit company for the property hereby mortgaged. The remainder of said bonds, amounting to two million one hundred and twenty-five thousand dollars par value, shall be certified and issued from time to time, as required for use by the transit company for its corporate purposes."

It will be seen from the foregoing that the bonds issued on the mortgage security were to be used: First, to pay for the Long Island Traction Company property; and, secondly, for other purposes for which the B. R. T. could use money in the proper exercise of its corporate powers. It further appears that it was estimated that not more than $4,875,000 par value of bonds would be needed for the purchase of the specific property then mortgaged, thus leaving $2,125,000 par value of bonds to be certified and issued from time to time as required for use by B. R. T. in carrying on its corporate business.

[1] In construing the after-acquired property clause, we start with

the time-worn canon of construction that the court must ascertain the intent of the parties.

The parties had concluded that the cost of acquiring the specific property mentioned in the mortgage would not exceed $4,875,000. There were still available for future purposes $2,125,000 of bonds. The corporate powers of B. R. T. were broad, and there is no language in the mortgage which indicates an intent to limit the use of the $2,125,000 of bonds to expenditures on the specific then existing property. On the contrary, the language is definite that the $2,125,000 of bonds should be certified and issued from time to time, "as required by the transit company for its corporate purposes"—i. e., for any of such purposes. To illustrate, if the proceeds of the reserved bonds were to be used to buy the stock of a railroad not referred to in the 1895 mortgage and the after-acquired clause were limited to the four items, then such new property would be free of the lien of the 1895 mortgage. It is difficult to conclude that so unbusinesslike a result was contemplated or that it could have been supposed that either the Stock Exchange would list these reserved bonds or that the public would buy them, if the security to which the bondholder could look did not include the property acquired with the proceeds of such bonds and was confined to an additional load solely on the existing property and the acquisitions mentioned in the four items.

[2] In other words, the intent of the parties as gathered from the instrument itself must have been to strengthen the security upon which purchasers of the $2,125,000 of bonds could rely by bringing in under the mortgage at least the property after acquired with the proceeds of these reserved bonds. In such circumstances it would be expected that the after-acquired property provision of the granting clause would not be confined to the four items. What has been said supra in respect of the reserved bonds is not to be understood, however, as limiting the after-acquired property clause to property acquired with these bonds, but as explaining at least one of the reasons why an after-acquired property clause was to be expected. In 1895 after-acquired property clauses had long been known, as the court may assume from reported cases. Their meaning and scope must, of course, be ascertained from the language used.

When the language of this granting clause is examined, it will be found that comprehensive words are used; i. e., "all and singular the property and franchises of the said transit company, whether now owned or hereafter acquired." If the clause had stopped there, no one would have doubted that it was intended to cover after-acquired property in addition to that mentioned in the four items. If, on the other hand, the word "acquired" had been followed immediately by "that is to say" and the four items, then Smith v. McCullough, 104 U. S. 25, 26 L. Ed. 637, would have been controlling authority; for in the four items are words of after acquisition, and it could be soundly contended that the words "that is to say" were words of limitation, holding the granting clause down to the property then existent and to the income, etc., thereafter to accrue, as described in the four items. But inter-

mediate the words "hereafter acquired" and the words "and does hereby hypothecate and pledge the same" are the words "including particularly the property hereafter described."

[3] It is another time-worn canon of construction that the court will not treat as useless words or phrases to which a natural meaning can be given. It is apparent from the mortgage itself that the only property contemporaneously susceptible of immediate description was that comprised within the four items. If it had been intended to confine the mortgage lien to that property and the after acquisitions mentioned in the four items, that intention could have been simply expressed by a phrase in substance as follows: "All and singular the following property and franchises, that is to say," 1, 2, 3, and 4. Items 1, 2, 3, and 4 contained within themselves all the future or after-acquired property clauses necessary and relevant to the subject-matter, such as: (1) "Hereafter acquire" Brooklyn Heights Railroad Company stock; (2) dividends, etc., to which B. R. T. "may hereafter become entitled"; (3) all right to the guaranty fund which "shall hereafter be vested" in B. R. T.; (4) all right "to the amount of the cost of all property, extensions * * * hereafter made, acquired, and paid for. * * *" If it was intended to limit the granting clause to the four items, then the "including" clause was meaningless.

There is, however, no mystery about this clause. Ordinarily the public is relied upon to absorb bond issues of this character, and it constitutes the market. An indefinite clause that a mortgage covers all the property a corporation now owns or may hereafter acquire does not convey any detailed information. Language showing that a mortgage covers certain specifically described existing property as well as property which the corporation may hereafter acquire calls attention, in any case, to the specifically described existing property, which is unquestionably mortgaged. Also, as between the parties, such language sets at rest from the outset any question as to what specific property is mortgaged in any event. It is quite usual and indeed sound draftsmanship to describe as clearly as possible the property in esse which the mortgage covers at the time it is created. The fact that such a clause is usual and not extraordinary is well illustrated by a clause in the 1902 mortgage precisely similar in this regard with the clause in the 1895 mortgage, reading "all and singular the property and franchises of the said transit company whether now owned by the transit company or hereafter acquired by the transit company with the proceeds of said bonds, including particularly the property hereinafter described, that is to say."

That the draftsman of the 1895 mortgage was quite devoted to the word "including" is further seen in the recital supra as to the purchase of the Long Island Traction Company property "including the capital stock of the Brooklyn Heights"—an expression very similar to that later used in the granting clause.

It is urged, however, that certain provisions of the 1895 mortgage indicate that it was not contemplated that the after-acquired property clause should embrace more than the after-acquired provisions in the

four items. It is pointed out that in article 2 of the 1895 mortgage specific provision is made that the company is to receive the dividends on the Heights stock, dividends, income, and increase from the Suburban stock, all income of the Heights Company in any way receivable by the B. R. T., and also the guaranty fund if it became payable, but that the article does not contain any general expressions whatever, and that there is not anywhere in the mortgage any provisions as to the income of property other than that specifically described.

Article 3 refers only to the safe-keeping of the Brooklyn Heights stock only, and article 4 is, in substance, limited to references to the same stock. Since 1895 instruments of this character have become more frequent and familiar, and draftsmen have had the advantage of more precedents and more experience. It is plain that what this draftsman had in mind was the making of appropriate provisions for specific property then known to all concerned, and his failure to make similar provisions for property then unknown which might thereafter be acquired should not be regarded as so significant as to destroy the otherwise plain meaning and intent of the after-acquired property clause; and it would be straining the meaning of the parties and avoiding their expressed intent to whittle such a clause down to specific existing items, because of limited references dealing with administrative details in subordinate provisions of the mortgage.

[4] The discussion thus far has dealt only with the construction of the instrument unaided by reference to surrounding circumstances. It is said, however, both in Smith v. McCullough, supra, and in the Sea Beach Case, that the court may look to the surrounding circumstances in aid of interpreting the mortgage. Particularly is this applicable here, because the Long Island Traction Company purchase is referred to in the 1895 mortgage.

The organization of B. R. T. and the execution of the 1895 mortgage both grew out of the insolvency of the Long Island Traction Company and the foreclosure of its collateral trust deed, dated August 1, 1894. The committee representing the holders of the collateral trust notes and the stockholders of the Long Island Traction Company caused B. R. T. to be formed and the 1895 mortgage to be executed in carrying out the foreclosure of the collateral trust deed and the reorganization.

The collateral trust deed of the traction company (Exhibit 38) had been executed in 1894 to secure $3,000,000 principal amount of collateral trust notes, of which $1,875,000 were in the hands of the public, and approximately $900,000 were pledged to secure a note for $620,000. The collateral trust deed had pledged under it as security the specific property mentioned in the four items, but did not contain any general after-acquired property clause; and the existing property described in the four items was the only property specifically named in each mortgage. On reorganization the old note holders of the Long Island Traction Company received for their notes an equal amount of bonds issued under the 1895 mortgage (viz. $1,875,000), $2,125,000 of bonds were reserved for corporate purposes, and the old stockholders of the Long

Island Company purchased $3,000,000 of bonds issued under the 1895 mortgage for $3,000,000 in cash. The $3,000,000 of cash was used as follows:

To acquire and provide for notes outstanding, about.............. $620,000
To acquire and provide for obligations and expenses of the receiver
  of the Long Island Traction Company to July 1, 1895, about....   600,000
To provide for claims for damages and otherwise against the
  Brooklyn Heights Company, the Traction Company and its Re-
  ceiver, about.................................................   500,000
To be used for betterments, for expenses of reorganization and
  other purposes...............................................  1,280,000
                                                                -----------
                                                                $3,000,000

Of the last-mentioned amount $889,704.87 was turned into the treasury of B. R. T. for use in its general corporate purposes.

Accordingly, when B. R. T. began business, it had acquired and paid for the existing property named in the four items, and also had approximately $900,000 of cash in its treasury, together with $2,125,000 of its 1895 mortgage bonds applicable to corporate purposes. As B. R. T. was a holding company, with practically no operating expense, and as these funds were not surplus of B. R. T. and could not be used for dividends, it must have been contemplated that the $900,000 (approximately) of cash and the $2,125,000 of reserved bonds would be used by it later in acquiring properties.

Prior to July 1, 1902, B. R. T. had applied to the Stock Exchange from time to time to list the $2,125,000 of bonds. These applications had been granted to the extent of all but $375,000. The bonds had been disposed of and property had been bought with their proceeds. (Exhibits 99-102, inclusive, refunding foreclosure; Exhibit 103 refers to the application as to $375,000 of bonds dated December 30, 1907.)

When, therefore, the 1902 mortgage was executed and delivered, the facts, readily ascertainable, would have demonstrated that the lien of the 1895 mortgage was not intended to be confined to the four items; for it had taken only $1,875,000 of bonds to wipe out the notes, and, in round numbers, $2,100,000 to clean up other reorganization expenses, making a total of $3,975,000 in round numbers, and there was thus available, from the start, about $3,025,000 in cash and bonds with which to acquire new property.

It is strongly urged, however, that under the Sea Beach Case this court must hold that the 1895 mortgage is confined to the four items. Of course, this court would feel itself bound to follow the decision of the Circuit Court of Appeals.

The Sea Beach Case, however, was different in several respects. In that case the court below considered only the questions discussed at page 537 et seq. of the opinion in the Sea Beach Case. The record now has been supplemented, inter alia, with the data showing the circumstances under which the 1895 mortgage was executed and delivered. The securities here under consideration are not in the possession of the receiver. The question here is as to liens between two mortgage trustees, not as to the rights of a receiver in possession of securities. It will be observed also that in the Sea Beach Case the court said:

"Its specification of the different kinds of property pledged indicates an intention to confine it to such properties as would be held in the ordinary course of the Brooklyn Rapid Transit Company's business as a holding company."

The securities purchased with the proceeds of the $2,125,000 of bonds and those securities in controversy which are in the possession of the 1902 trustee are securities which B. R. T. had the power to buy, sell, exchange, or hold in the ordinary course of its business. It must be assumed, therefore, that the decision of the Circuit Court of Appeals in the Sea Beach Case was intended to be confined to the particular controversy then before the court, and, as the questions of law and fact on this record are not the same as those presented in the Sea Beach Case, it is consequently the duty of this court to dispose of this case on its own record.

[5] The next question is the relation of the 1895 mortgage to the 1902 mortgage. The after-acquired property clause of the 1895 mortgage, under the construction given to it in this opinion, was broad; but, as said by Judge Taft in Harris v. Youngstown Bridge Company, 90 Fed. 322, at page 329, 33 C. C. A. 69, at page 75:

"Where the legal or equitable title of the mortgagor ripens and is acquired only through the outlay or expenditure of another, under such circumstances that, as between the other and the mortgagor, the former has a lien in equity upon the interest of the latter, the prior mortgage with an after-acquired property clause attaches only to the interest of the mortgagor subject to the same lien."

Analogously, where property is acquired by a later bond issue under circumstances where it is plain that the later bonds or their proceeds would not have been created and utilized to acquire such property without the safeguard of a first lien, then property so acquired is not first subject to the lien of a prior mortgage, unless the prior mortgage, by express language, warns subsequent mortgagees that such after-acquired property will be subject to the lien of the prior mortgage.

It is true, of course, that a mortgagor and a subsequent mortgagee cannot change the rights of a mortgagee under a prior mortgage; but that elementary principle does not mean that the mortgagor may not acquire new property with the funds of a third party under circumstances where the third party either protects himself or is protected in equity by a purchase-money lien.

As was also said by Judge Taft in the Harris Case supra:

"It may very well be that, unless the purchase money is secured by a first lien, no addition will be acquired. The security of the first mortgage is increased by the difference between the value of the addition bought and the part of the price which the mortgagor did not pay. It is not perceived what prejudice the mortgagee suffers by the transaction. His security is certainly not worse, and it may be a great deal better."

In the case at bar some or all of the transactions engaged in under the terms of the 1902 mortgage may not have given rise, technically, to purchase-money liens, but equity will not be deterred from protecting the 1902 trustee in those cases where the use of bonds or their proceeds and the acquisition of new property were part of the same trans-

action, and the title, if any, of B. R. T. was a mere incident of the same transaction.

As was further said by Judge Taft in the Harris Case, supra:

"There is a clear distinction between the obligations of a mortgagor under a mortgage in which the property described as mortgaged, though definitely described, is yet to be bought and constructed, and the obligations of one under a mortgage in which the property described as mortgaged is in existence as a completed thing, and the after-acquired property clause is inserted only to increase the original security. In the former class of cases the mortgagor is impliedly bound to buy and complete the thing mortgaged as described, and bring it under the lien of the mortgage, without burden or incumbrance. Such was the case of Wade v. Railroad Co., 149 U. S. 327, 13 Sup. Ct. 892; and such, too, is the case of Benner v. Trust Co. (decided to-day by this court) 90 Fed. 348. In the latter class of cases the mortgagor is bound neither to make additions, nor, if he does make them, to free them from prior liens arising in and out of the act of acquisition."

So in the case at bar there is a marked difference between (1) the property acquired by B. R. T. after the 1895 mortgage with funds over which it had unrestricted control and (2) property acquired with the 1902 bonds or their proceeds under an agreement that, as a condition of the acquisition by B. R. T., such property must be deposited with the 1902 trustee and subjected to the lien of the 1902 mortgage. The latter class of property was intended to be created only if the lender were secured by the very property to acquire which the bonds were to be authenticated and delivered.

The terms of the 1895 mortgage were quite different from those discussed in Boston Safe Deposit Trust Co. v. Bankers' & Merchants' Tel. Co. et al. (C. C.) 36 Fed. 288. In that case, in order to gain control of the American Rapid Telegraph Company, it was agreed that the first mortgage should cover, inter alia, property thereafter to be built or acquired by the Bankers' & Merchants' Telegraph Company. The language was plain, and the transactions showed the intent of the after-acquired property clause. No such language is used in the 1895 mortgage. Indeed, in item IV of the 1895 mortgage it will be noted that the after-acquired property there mortgaged is the right, title, and interest of B. R. T. in and to "the amount of the cost of all property, extensions, branches, additions, improvements, and equipments * * * hereafter made, acquired, and paid for by" Brooklyn Heights or B. R. T. "out of their own funds for use in connection with the operations of the Brooklyn City Railroad Company. * * *" Surely "out of their own funds" could not have been intended to mean funds created by a new bond issue under circumstances which did not permit B. R. T. to deal with the property acquired by such funds in its uncontrolled discretion, but required that such property should be placed under the lien of the later mortgage.

In the 1902 mortgage, while (referring to existing property) it was realized that the mortgage was "subject as to certain portions of said property hereby mortgaged and pledged to the lien of" the 1895 mortgage, yet at the same time it was intended that procedural machinery should be erected whereby property acquired after the 1902 mortgage with 1902 bonds or their proceeds should be subject to its first lien. Such machinery was erected.

Under article 1, section 2, of the 1902 mortgage, contemporaneously with the execution and delivery of the mortgage and a certified copy of the resolution of the B. R. T. directors, the trustee was required to authenticate and deliver to or upon the order of the president or vice president of B. R. T. $5,000,000 of bonds. B. R. T., however, was not authorized to use these bonds as it pleased, nor to dispose as it pleased of property acquired with those bonds or their proceeds. It was provided:

"The said bonds and all other bonds authenticated and delivered under the provisions of this section shall be held and used by the transit company as a fund for the purpose of making, furnishing, or acquiring equipments, betterments, improvements, additions, and extensions to its own property or to the property of any corporation * * * and for the purpose of acquiring by purchase, exchange, or otherwise additional stocks, bonds, securities, obligations, or property of any description. For any such bonds or the proceeds thereof used for the purpose of making, furnishing, or acquiring equipments, betterments, improvements, additions, and extensions to the property of any corporation except the transit company, the transit company shall take stock or obligations of the corporation benefited and deposit such stock or obligations with the trustee. No part of the bonds issued under the provisions of this mortgage or the proceeds thereof shall be used in payment of the operating expenses of the transit company, or of any such corporations, or of any of the constituent corporations of the transit company, or in payment of the interest on any bonds or other obligations of or for rentals payable by the transit company or any of said corporations. * * * "

It will be noted from the foregoing that the bonds or their proceeds were to be used for purposes specifically named, and that B. R. T. "shall" take stock or other obligations of the corporation benefited by the expenditures. B. R. T. could not then do what it pleased with such stock or obligations. It was required ("shall * * * deposit") to deposit such stock or obligations with the trustee. The $5,000,000 was in the nature of a revolving fund. Hence, carrying out the scheme of the mortgage, it was provided:

"Any and all property acquired by the transit company by the expenditure from time to time of any part of such bonds or the proceeds thereof shall be transferred to or deposited with the trustee and shall immediately become and be subject to the lien of these presents, with the same effect as if it were specifically described, conveyed, and assigned in and by this mortgage at the time of the execution thereof."

Certain provisions are then made in sections 3 and 4 of article 1 in respect of underlying bonds, and then under section 5, "Issue of Bonds to Acquire Additional Property," the following appears:

"The remainder of the bonds authorized to be issued under and secured by this mortgage shall be authenticated and delivered from time to time by the trustee, and shall be used by the transit company only for the purpose of acquiring by purchase, exchange, or otherwise stocks, bonds, securities, or other property of any kind whatsoever which the transit company shall be legally authorized at the time to purchase or acquire.

"Whenever, from time to time, the transit company shall request the authentication and delivery of any bonds for any of the purposes mentioned in this section, the principal amount at par of the bonds issued, authenticated, and delivered therefor shall in no event exceed the actual cost to the transit

company of the stocks, bonds, securities, or other property as acquired by the transit company.

"The bonds to be issued under this section shall be authenticated and delivered by the trustee to or upon the order of the president or a vice president of the transit company, upon conveyance, delivery, or transfer to the trustee of the bonds, stocks, securities, or other property for acquiring which bonds are authorized to be authenticated and delivered under this section, and upon request of the transit company expressed in a resolution of its board of directors or executive committee, requesting authentication and delivery thereof, stating the amount and purpose or purposes for which such bonds are required, together with an affidavit of the president or a vice president of the transit company giving a detailed statement of the actual cost to the transit company of the stocks, bonds, securities, or other property acquired as aforesaid and transferred to or deposited with the trustee. * * *

"All of the stocks, bonds, securities, and other property acquired by the transit company with the bonds or the proceeds thereof, so authenticated and delivered, for any of the purposes mentioned in this section, when conveyed, delivered, transferred to, or deposited with the trustee as aforesaid, shall become and be subject to the lien hereof as fully and completely as though specifically described herein as being mortgaged or pledged hereunder."

It may perhaps be variously argued that section 5, supra, is susceptible of one of the two following constructions: (1) That bonds were to be authenticated and delivered to B. R. T. contemporaneously (in the sense of the same transaction) with the acquisition of property by B. R. T.; or (2) that bonds were to be authenticated and delivered whenever B. R. T. so requested, even though B. R. T. had previously acquired the property with general funds or in some manner otherwise than with bonds authenticated and delivered for the purpose of acquiring the property contemporaneously—i. e., in the sense of the same transaction.

As between the parties (i. e., B. R. T. and the 1902 trustee), it does not make any difference whether property was deposited with the trustee in accordance with one theory or the other or both. As between the two trustees, however, only that property can escape the lien of the 1895 mortgage which was acquired with bonds which had been authenticated and delivered for the purpose of enabling B. R. T. to acquire property from a third party, as distinguished from transactions where B. R. T. acquired property, not with 1902 bonds nor with their proceeds, but with general funds or in some way other than with the 1902 bonds or their proceeds, and thereafter obtained bonds from the 1902 trustee for such property.

The words "bonds" and "proceeds of bonds" have been used supra as interchangeable terms, because, while the granting clause uses the words "proceeds of said bonds," the context (article 1, sections 2 and 5, particularly) indicates that "bonds" and "proceeds of bonds" are synonymous terms.

In brief, the purpose of the 1902 mortgage was to acquire new property with a string attached which should draw the new property under the lien of that mortgage by a procedure analogous with that which assures a purchase-money lien. Whether this purpose was successfully carried out depends in each instance upon what, in fact, was done.

In the foregoing discussion the expression "same transaction" has been used on several occasions. It is not practicable to define this ex-

pression theoretically. What is "the same transaction" depends largely on the facts, and in this case it may well be that the liens in respect of some of the property in controversy cannot be determined without an inquiry into the history of the acquisition and disposition of such property.

[6] In the foregoing discussion also it has been assumed that it is now settled that under the law of New York a mortgage covering after-acquired property of the character here in controversy creates an equitable lien which is good as against a subsequent mortgagee with notice. Titusville Iron Co. v. City of New York, 207 N. Y. 203, 100 N. E. 806; In re P. J. Sullivan Co., 254 Fed. 660, at page 662, 166 C. C. A. 158.

The conclusions arrived at may be thus summarized:

A. The 1895 mortgage has a first lien in equity on: (1) Property acquired with the proceeds of the $2,125,000 of bonds; (2) property acquired with the $889,704.87; (3) such property after acquired by B. R. T. as is not subject to the lien of the 1902 mortgage as indicated in C, infra.

B. The 1895 mortgage has an equitable lien subject to the first lien of the 1902 mortgage in after-acquired property of the character referred to in C, infra.

C. The 1902 mortgage has a first lien on: (1) Property acquired with the proceeds of bonds under article 1, section 2, of the 1902 mortgage where the procedure therein set forth was followed; (2) property acquired with bonds authenticated and delivered to B. R. T. where such property was acquired by B. R. T. and deposited with the 1902 trustee under circumstances where the authentication and delivery of bonds, the acquisition of property, and the pledge with the trustee were all parts of the same transaction.

D. The 1902 mortgage has a lien junior to the 1895 mortgage, where property was deposited with the 1902 trustee under circumstances not falling within those outlined in C.

In view of the foregoing conclusions, it is apparent that the court is unable upon this record to determine in detail the liens on the property involved, and it becomes necessary, therefore, to send the issues back to the special master, unless counsel can devise some simpler method of attaining a result upon which a decree may be predicated.

The court has been requested to determine upon which trustee rests the burden of proof, but this and other questions will not be anticipated. The master, who is highly experienced, may apply to the court for instructions from time to time, as he may be advised.

It will be observed that questions of practical construction, knowledge of trustees in certain respects, and other questions have not been discussed, because regarded as not necessary for the purposes of this opinion. Whether such questions need be later considered will be, in the first instance, for the master to determine, as the litigation progresses.

It is to be understood that this opinion is confined solely to the question of liens as between these two trustees. Other questions of fact

and law may apply to the status of claims of general creditors or to the status of certain of the securities, where transactions have occurred which affect the rights of parties other than these trustees.

Settle order on notice.