**R. E. DUVALL CO., Inc., v. WASHINGTON, B. & A. ELECTRIC R. CO. (CLEVELAND TRUST CO., Intervener).**

No. 1826.

District Court, D. Maryland.

July 21, 1931.

George Weems Williams, of Baltimore, Md., for Washington, B. & A. Electric R. Co.

Semmes, Bowen & Semmes, of Baltimore, Md., for Cleveland Trust Co., trustee.

Cook & Markell, of Baltimore, Md., for Consolidated Gas, Electric Light & Power Co.

Venable, Baetjer & Howard, of Baltimore, Md., for Maryland Trust Co., trustee, et al.

Clarence A. Tucker, of Baltimore, Md., for Fidelity Trust Co., trustee.

Bartlett, Poe & Claggett, of Baltimore, Md., for J. Sawyer Wilson, Jr., et al. committee.

SOPER, Circuit Judge.

On January 27, 1931, a receiver was appointed by this court for Washington, Baltimore & Annapolis Electric Railroad Company, hereinafter called the railroad company, upon a bill of complaint filed by its creditors and upon its admission of insolvency and consent. The Cleveland Trust Company, hereinafter called the trustee, was given leave to intervene as party plaintiff in the case in order to protect the rights of bondholders holding bonds to the amount of $7,308,000, which are secured by a mortgage on the property of the railroad company dated March 1, 1911, and executed and delivered on March 31, 1911, by the railroad company to the trustee. On March 1, 1931, the railroad company defaulted in the payment of an installment of interest due on the bonds. On May 15, 1931, the trustee filed a petition in the case praying for an order directing the receiver and the railroad company to assign and deliver to it certain shares of stock of certain Maryland corporations, to wit, 39,271 shares, without par value, of the capital stock of the Annapolis & Chesapeake Bay Power Company, hereinafter called the power company, 10 shares of the par value of $100 each of the Terminal Real Estate Company of Baltimore City, Md., hereinafter called the terminal company, and 400 shares of the par value of $50 each of the Maryland Development & Realty Company of Anne Arundel County, Md., hereinafter called the Maryland company. The shares of stock above described constitute all the outstanding stock of the respective corporations. All of the stock of the power company and all of the stock of the terminal company belong to the railroad company, and all of the stock of the Maryland company belongs to the terminal company.

The trustee asserts that the stock is covered by terms of the mortgage whereby property owned by the railroad company at the time of the execution of the mortgage, or acquired thereafter, was made subject to its lien; and that since a receiver has been appointed for the railroad company on the ground of insolvency, and a default has been made in the payment of interest on the bonds, the trustee has become entitled to delivery and possession of the stock and to receive and hold the revenues, income, and profits therefrom under the terms of the mortgage. Answers to the petition have been filed by creditors of the railroad company, not protected by the lien of the mortgage. They point out that shares of stock are not mentioned in the grant, and contend that property of that kind is not subject to the lien of the mortgage, if that document is properly interpreted, but belongs to the railroad company, free and clear of any lien. The issue thus raised constitutes the main question to be decided in this case.

The trustee, in support of its contention, relies upon the express terms of the granting clause of the mortgage, and particularly upon the sweeping character of the language employed in its final paragraph. The grant itself and a description of the property thereby conveyed may be summarized for our purposes as follows:

"The Railroad Company, party of the first part, conveys to the trustee upon the trusts created by the mortgage, *'all the right, title, interest and estate of the first party in and to the entire railroad of the party of the first part, as follows'*:

1. "The terminal station in the City of Baltimore and its line of railroad, rights of way, privileges and rights of tracks in the City of Baltimore, beginning at a certain described point therein and extending through certain streets in the city and thence through certain counties in Maryland to the boundary

**568**

line between the State of Maryland and the District of Columbia.

2. "Also a line of single railway track extending from a point on the railroad in Anne Arundel County in an eastern direction to the City of Annapolis and a line of single track in that city.

3. "Also all the terminals, terminal tracks, railroad facilities, engines, rolling stock, electric appliances, bridges, &c., enumerating in all 39 classes of tangible railroad property, 'and all other estate, property and right of every and any kind and class now or hereafter owned or acquired or to any extent controlled or possessed by the Railroad Company belonging to or used or designed for use for or in connection with said terminal stations and said lines of railroad.'

4. "Also franchises granted to the Railroad Company by the City of Annapolis to use the streets of the city for railroad purposes.

5. "Also franchises granted to the Railroad Company by the City of Baltimore to use the streets of the city for railroad purposes.

6. "Also rights under three separate contracts to use the tracks of certain street railways in Baltimore and Washington, or the power thereover, and to acquire power for the operation of the railroad.

7. "Also, all contracts, rights, revenues, rents, tolls, sums of money or income arising or to arise from the property now owned or controlled or hereafter to be acquired or controlled by the Railroad Company, and each and every part and parcel thereof, and also all corporate or other franchises, rights, easements, privileges and immunities now or at any time hereafter owned, held or enjoyed by or in any manner conferred upon the Railroad Company; *it being the intention hereof to include herein all of the property of the Railroad Company, real, personal or mixed, in possession or expectancy, now owned or hereafter in any wise acquired*, together with all and singular the tenements, hereditaments, rights, franchises, easements, privileges, immunities and appurtenances of such property and premises hereinbefore expressed to be conveyed, or which may in any manner hereafter be acquired by the Railroad Company, *belonging or in any wise appertaining to, or at any time hereafter held or enjoyed by the Railroad Company,* and the reversion and reversions, remainder and remainders, tolls, incomes, revenues, rents, issues and profits thereof, and also all the estate, right, title

and interest, property, possession, claim and demand whatsoever, as well in equity as in law, of the Railroad Company, in and to the same and every and any part thereof; it being intended and it is hereby agreed that all the property of every kind now owned or which may be in any wise acquired by the Railroad Company shall be as fully embraced within the provisions hereof, and subject to the lien hereby created for securing the payment of all of said bonds so to be issued, together with the interest thereon, as if the said property were now owned by the Railroad Company, and were specifically described herein and conveyed hereby." (Italics inserted.)

It is obvious that the language of this concluding paragraph, taken by itself, is sufficiently broad to include the shares of stock which the trustee now claims. And it may be conceded for the purposes of this case that a railroad may mortgage after-acquired property. Thompson v. White Water Valley R. Co., 132 U. S. 68, 10 S. Ct. 29, 33 L. Ed. 256, and that there is no reason for applying to securities any other or different rule as to after-acquired property than is applied to other kinds of property. United States Mtge. & Trust Co. v. Chicago & A. R. Co. (C. C. A.) 40 F.(2d) 386, 392. It may also be conceded that the mere fact that a granting clause includes a specific description of existing property does not necessarily limit or qualify subsequent general provisions of a broader scope. Compare Westinghouse Elec. & Mfg. Co. v. Brooklyn R. T. Co. (D. C.) 276 F. 152; Id. (D. C.) 288 F. 221; and American Brake Shoe & Foundry Co. v. New York Rys. Co. (D. C.) 277 F. 261, with Smith v. McCullough, 104 U. S. 25, 26 L. Ed. 637, and Alabama v. Montague, 117 U. S. 602, 6 S. Ct. 911, 29 L. Ed. 1000. It may also be noted in passing that the specific limitation upon after-acquired property to that which belongs to or is used in connection with terminal stations or lines of railroad, which is quoted in clause 3 above, does not appear in the concluding paragraph. Nevertheless, there are other provisions of the mortgage and other material facts now to be considered which throw a strong light upon the kind of property which the parties intended to cover by the terms of the mortgage.

It is highly significant that the introductory paragraph of the granting clause, which contains the words of conveyance, also gives a general description of the property conveyed as "all the right, title, interest and estate of the first party in and to the entire

railroad of the party of the first part, as follows." These words manifest an intention of the mortgagor to grant and convey complete title to its entire railroad, but they purport to convey no other property. The long description of the items of the property set out in the mortgage immediately after the words "as follows" has been summarized above, and it will be noted that in all of the paragraphs but the last, only property, tangible and intangible, which is useful in the operation of the railroad, is included. The final paragraph comprises all property of the railroad company, real, personal, and mixed, and is not in terms limited to property devoted to railroad purposes; but since all of the paragraphs after the effective words of conveyance are expressly inserted as descriptive of the railroad itself, it is not an unreasonable conclusion that all of the paragraphs were intended to relate to the same kind of property.

Certain recitals of the mortgage bear out this conclusion, particularly those which embody the resolutions of the board of directors and of the stockholders, whereby the execution of the mortgage was authorized. The mortgage recites that at a meeting of the board of directors of the railroad company on March 31, 1911, it was resolved that, in order to provide funds to pay debts and to acquire certain railroad properties, it was necessary to issue and sell bonds and "in order to secure the payment of said bonds, issued and to be issued, and sold, with interest thereon, this company issue a first mortgage deed of trust bearing date the first day of March, 1911, to the Cleveland Trust Company of Cleveland, Ohio, as trustee, covering the terminal stations, terminals, lines of railway, rights of way, real estate, franchises *and other property of this company used in connection with the operation of said terminals and lines of railroad now owned or hereafter acquired and wherever situated*, together with all of its rights and privileges." (Italics inserted). The board also approved in the same resolution the form of the bond set out in full in the mortgage, and the form of the mortgage itself.

The form of bond declares that the bonds to be issued under the mortgage are secured by a mortgage deed of trust "conveying the terminal stations, terminals, lines of railway, real estate, franchises and other property of this Company used in connection with the operation of said terminals and lines of railroad now owned or hereafter acquired, and wherever situated together with all of its rights and privileges," using the same language as appeared in the resolution of the board. On the same day, the resolutions of the board and the form of mortgage were approved at a meeting of the stockholders. From these recitals, it seems to be clear that it was the intention of the corporate authorities, from whom the power to execute the railroad mortgage was derived, to limit the lien of the mortgage to property, whether then owned or thereafter acquired, which was used in connection with the operation of the terminals and lines of railway.

▮ It is suggested by the trustee that the resolutions of the board and of the stockholders, having approved the broad language of the grant in the mortgage actually executed, must be considered as having authorized a lien upon all property of the railroad without any limitation or restriction whatsoever; but it is impossible to suppose that it was the intention of these bodies to direct the execution of a mortgage unlimited as to the property covered, when in the same resolutions there was the express limitation that the lien of the mortgage should cover property used in connection with the operation of the railroad. It must be assumed, of course, that the directors and the stockholders were aware of the sweeping provisions of the last paragraph of the granting clause, and intended to give it full force and effect. But the plainly expressed purpose of the governing bodies of the corporation to limit the extent of the lien of the mortgage must also be given effect, if it can be done consistently with the terms of the grant.

▮ It goes without saying that the intent of the parties must be gathered from the provisions of the instrument taken as a whole. The problem is reduced to a determination of whether the final paragraph of the grant shall be read apart from the other clauses of the mortgage, so as to include all property of every description, or shall be considered as limited to the kind of properties described in the preceding paragraphs of the grant. If the former alternative is adopted, it is not possible to give effect to the limitation which the board of directors and the stockholders obviously desired to place upon the scope of the lien. If the latter alternative is adopted, all portions of the mortgage are consistent, and the broad language of the final paragraph of the grant is given an effect in harmony with the preceding paragraphs and with the terms of the corporate resolutions. The conclusion seems to be inevitable that, in this mortgage, the lien was restricted to property, whether then owned or thereafter acquired,

used in connection with the operation of the terminals and lines of railway. The rules established for the interpretation of written instruments do not justify the detachment of general words from accompanying expressions of an explanatory character, and often times, as in this case, a broad phrase must be construed as ejusdem generis with more limited descriptions in order to give effect to the obvious intention of the parties. Indeed it has been laid down broadly that general words in any contract pertaining to a particular subject shall be construed as meaning things of the same kind as the particular matters referred to. Williston on Contracts (1920) 1201; See Smith v. McCullough, 104 U. S. 26, 28, 26 L. Ed. 637; Alabama v. Montague, 117 U. S. 602, 6 S. Ct. 911, 29 L. Ed. 1000; Guaranty Trust Co. v. Minneapolis & St. L. R. Co. (C. C. A.) 36 F. (2d) 747.

■ We come then to determine whether the shares of stock which the trustee seeks to recover fall within the lien of the mortgage as property owned at the time of its execution or thereafter acquired and used in connection with the operation of the railroad. The subsidiary corporations, the stock of which is in question, are completely owned by the railroad company, and, with some exceptions, substantially the same persons who have been officers and directors of the railroad company have acted in the same capacity for the power company and the terminal company. The shares of stock have never been assigned to the trustee under the railroad company's mortgage, and have never been pledged, hypothecated, or assigned to any other person so that the certificates of stock stand in the name of the railroad company, and are now in the possession of the receiver. The stock of the power company has been carried on the books of the railroad company in its investment account, and was so carried on its balance sheet in its annual report until the year 1924. In 1924 and subsequent years, the railroad company has published a consolidated balance sheet of itself and its subsidiaries in which, pursuant to regular accounting practice, the stock has been eliminated both as an asset and as a liability, and the property of the subsidiary corporations has been included among their assets. There are other circumstances surrounding the acquisition of the several blocks of stock, and affecting the character of the business done by the several corporations, which must be separately considered.

The power company was incorporated in Maryland in 1912. In the following year,

with the consent of the public service commission of Maryland, it acquired all the property of Annapolis Gas & Electric Light Company, a Maryland corporation, engaged in furnishing the public with gas and electricity for light and power in Annapolis. In 1913, and in subsequent years, the railroad company acquired all of the capital stock of the power company now consisting of 39,721 shares of no par value. The total cost of the stock was $172,700 which the railroad company paid out of its earned surplus. At the present time, and for some years past, the power company has been engaged in furnishing to the public electricity for light and power in certain counties of Maryland, and in furnishing gas in the city of Annapolis. It owns electricity and gas distribution systems in the territory which it serves. It has issued mortgage bonds secured by mortgage on its property, and also certain secured and unsecured demand notes representing loans, the proceeds of which have been used in making capital expenditures for construction. The value of the property and franchises of the power company is in excess of the amount of its indebtedness.

The railroad company has never produced electricity, but has always purchased all that it needed in its own business. It has also purchased electricity and sold it at a profit to the power company under its control. This practice was pursued from 1913 to July 1, 1923, when it was embodied in a written contract, wherein the power company agreed to purchase such electricity as it might desire from the railroad company. This contract has been the subject of interpretation in this court, and has been held to constitute merely an option on the part of the power company, and not a binding obligation, to purchase such electricity as it might need from the railroad company. The contract price was fixed at such a figure that there was a substantial profit accruing to the railroad company, which represented the difference between the cost of the electricity furnished to it by the producer, and the selling price thereof paid by the power company.

In 1928, the transmission lines of the Consolidated Gas, Electric Light & Power Company of Baltimore, were extended so as to connect directly with the lines of the power company; and thereafter and until July 1, 1930, the power company purchased its supply of electricity from the gas company at a price substantially less than it had previously paid. On the latter date, the power company resumed the purchase of elec-

tricity from the railroad company under the contract above described. Since the railroad company was running at a loss during the year 1930, it is a fair inference that the purchase of the power under the contract was resumed in order to assist the railroad company in its failing condition. This situation continued until the following year when by the decree of this court passed on the 10th day of June, 1931, the contract was construed and the further purchase of electricity from the railroad company was directed to be abandoned.

The railroad company, was obliged to spend approximately $2,700,000 for transmission lines and equipment for use in the operation of the railroad. This amount included expenditures in the sum of $79,112.27, which were made in 1913 for an additional substation building and equipment and an additional transmission line, which were used by the railroad company not only in connection with the operation of its railroad, but also in connection with the furnishing of electricity to the power company. After 1913, additional expenditures not exceeding $50,000 were made by the railroad company for similar purposes as the aforesaid $79,112.27. The furnishing of electricity to the power company required a greater substation and transmission capacity than the operation of the railroad alone.

The direct sale of electricity by the railroad company to the public has been quite limited. It has never sold electricity to the public in Annapolis, but has sold it for light and power to a few rural customers along its line of railroad before the power company began business in 1913. After that date, the railroad company sold to fewer rural customers, to the United States government at Camp Meade and at its high power radio station, and to the Maryland State Hospital at Crownsville. Since 1923, the railroad company has made no sales of electricity.

From these undisputed facts, it is certain that neither the shares of stock of the power company nor its tangible property have been used by the railroad company in connection with the operation of its terminals or its railroad line. The business of the power company has been entirely separate and distinct therefrom. It has been connected with that of the parent company only in the purchase of electricity and the use by the railroad company of a part of its equipment primarily employed for the transmission of power to operate its railroad lines for the purpose of delivering electricity from the generating company to the power company's lines. The railroad company found it to be profitable to employ a part of its property for this purpose, but this activity on its part clearly served no railroad purpose, and could readily have been abandoned by it without in anyway interfering with the conduct of its railroad business. In that operation, the tangible property of the power company was neither needed nor employed. The conclusion follows that neither the stock of the power company nor its tangible property is subject to the lien of the mortgage.

The situation with regard to the stock of the terminal company and its tangible property is somewhat different. The terminal company was incorporated in 1906 with a nominal capital of 10 shares of stock of the par value of $100 each. All of its stock was acquired by the Washington, Baltimore & Annapolis Electric Railway Company, and became subject to the lien of mortgages, executed by it in 1905, which conveyed all of the lines of railroad of the mortgagor, its property rights, privileges, franchises, estate, and appurtenances, and all other property of every kind then owned or thereafter to be acquired. These mortgages were foreclosed by a decree of this court of February 10, 1911, and, in the sale and property conveyances which followed, the present railroad company acquired not merely the railroad properties, but also the stock of the terminal company. These mortgages of the railway company, in contrast with the mortgage under discussion conveyed, not merely railroad property, but all property of every description, and also made provision for the contingency that shares of stock might be covered by its terms, since it provided that the mortgagor should have the right, pending default, to vote upon all shares of stock which might be covered by the instrument. All of the property of the railway company, including the terminal stock, was sold at foreclosure sale, and was described in the conveyances to the purchasers and in the mesne conveyances through which the railroad company acquired title. The railroad company acquired the stock of the terminal company on or about March 31, 1911, by deeds which also conveyed the franchises and contract rights specified in the granting clause of the mortgage, as above set out, all of which related to railroad purposes. These deeds were executed and delivered to the railroad company immediately before it executed the mortgage under discussion. When that document was drawn, the contract rights and

franchises were specifically described as covered by the grant, but all mention of the stock of the terminal company was omitted. Likewise provision for the voting of shares of stock by the mortgagor, pending default, was left out. Moreover, the terminal stock was not delivered or assigned to the trustee named in the mortgage, although it had been assigned and delivered to the mortgagor. Hence there appears to have been an intentional omission of the stock from the mortgage executed immediately after its acquisition. These circumstances furnish additional reasons for holding that the railroad company's mortgage does not cover the stock of the terminal company. However, when the facts with reference to certain tangible property of the terminal company and the use to which it has been put are taken into consideration, it appears that at least a part of the physical assets of the company are fairly within the descriptive terms of the railroad mortgage.

The history of the company shows that it has been used by the railroad company to take title to land, of which some parcels have never been used for railroad purposes, while others have been so used in the past and are so used at this time. The charter of the corporation was amended in 1919 so as to provide for the purchase of lands in the District of Columbia, and the erection of a building thereon to be used as a railroad terminal. As a matter of fact, the terminal company erected a Washington terminal and sold it to the railroad company.

When the railroad company acquired the stock of the terminal company in 1911, the only property owned by it was improved and unimproved real estate, all of which had been acquired before 1908, and none of which was used for railroad purposes. In 1912, some of this property was sold, and in 1912–13, land in Washington was purchased, the funds for which were borrowed in part from the railroad company. This property was bought for the erection of a freight station to be sold to the railroad company, but the land was found to be unsuitable and was subsequently sold at a profit. Part of the purchase price was secured by mortgage of which an unpaid balance still belongs to the terminal company.

In addition, the company now owns about $6,000 worth of land, none of which is used for railroad purposes. It also owns that portion of the line of railroad formerly belonging to the Baltimore & Annapolis Short Line Company which extends from Shipley northwardly to the city of Baltimore. The Short Line Railroad was operated as an independent railroad until 1921, primarily for passengers, but also for freight from Annapolis to Baltimore. Its track extended from Annapolis to a point near Baltimore city, and thence over the lines of the Baltimore & Ohio Railroad to that railroad's terminal in the city. At or near Shipley, a point six miles south of Baltimore, the Short Line Railroad was in close proximity to the line of the Washington, Baltimore & Annapolis Railroad, the defendant company. In 1921, the Short Line Railroad Company abandoned operations and entered into an agreement with the defendant for the operation of the Short Line trains from Shipley to Baltimore over the defendant's tracks into its terminal. At the same time, all the property and franchises of the Short Line from Annapolis to Shipley were sold to the defendant railroad, subject to the lien of two mortgages previously executed; while the Short Line Railroad, north of Shipley, was sold and conveyed to the terminal company. The liens of the mortgage of the Short Line Railroad Company on the last-mentioned section of its road were released by the trustee named in the mortgages on the ground that the property was considered no longer necessary or desirable for use in connection with the railroad. The public service commission of Maryland also approved the abandonment of the use by the Short Line of that part of its road north of Shipley.

The Short Line Railroad received no cash for its property, but acquired the right to use the track of the defendant railroad from Shipley to Baltimore and the latter's terminal in that city, and the defendant railroad company guaranteed the payment of the Short Line's mortgages. In short, the consideration for the Short Line's property was given by the defendant railroad company, but that part of the line north of Shipley was nevertheless conveyed by deed to the terminal company, which company gave its note to the defendant railroad company in the sum of $200,000 in payment for the following properties: (1) The Short Line Railroad north of Shipley at $150,000; (2) a substation at Linthicum (since conveyed to the defendant) at $30,000; and (3) the capital stock of the Maryland Development & Realty Company at $20,000. Of this total of $200,000, $140,000 is still due by the terminal to the railroad company.

Since these conveyances were made in 1921, the only trains from Annapolis to

Baltimore over the Short Line have run over the defendant's track from Shipley to Baltimore, and no passenger trains have been run over the Short Line between Shipley and Baltimore. However, the north portion of this part of the Short Line, comprising about four miles out of six, has since been continuously used by the defendant railroad company for the storage of cars and also for the interchange of freight traffic with the Baltimore & Ohio Railroad Company and with the Western Maryland Railroad Company. The defendant company maintains the property but does not pay rent or any other charge therefor, nor does it receive or charge any interest on the balance of the demand note due to it by the terminal company.

From this description, it is clear that no part of the property of the terminal company is used for railroad purposes except that part of the Short Line Railroad between Shipley and Baltimore, and that this part has since been continuously used by it for railroad purposes. Consequently, it falls within the express description of other property used in connection with the operation of its terminals and lines of railroad, and is subject to the lien of the mortgage. No further discussion is needed to demonstrate that the property in fact belongs to the defendant railroad, and that the retention of legal title by the terminal company, for purposes of convenience, does not affect the real character of the situation. The shares of stock of the terminal company and its other real estate have no part in railroad operations, and are held by the railroad company free from the lien of the mortgage; but the short line north of Shipley, in contemplation of a court of equity, is held subject to that lien, and such corporate action should be taken as may be necessary to effect a conveyance of the property to the trustee subject to the terms and conditions of the mortgage.

The only other property owned by the terminal company is the capital stock of the Maryland Development & Realty Company consisting of 400 shares of the par value of $50 each, which it acquired in 1921. The Maryland company was incorporated for the purpose of dealing in real estate in 1907 and now owns land of the book value of $15,799.16, adjoining the railroad terminal at Annapolis. The Maryland company owns other real estate of the value of $2,300. The land adjoining the defendant's terminal at Annapolis is used by the defendant as a sort of public square and approach con-

venient and conspicuous, but not indispensable to the terminal. The taxes on it are paid by the railroad company. This land is also held in equity subject to the mortgage lien, and formal conveyance to the trustee should be made.

A decree will be signed in accordance with this opinion.